Thank you. You're welcome. Mr. Azak? Exactly. And I am impressed. May it please the court, my name is Richard Azak and I represent the Appellant Bond Tool Company in this case. This is a case, it's a patent law case involving both false marking and infringement claims. And at the end of trial, the district court below recognized on the record that the Appellee Forest Group had shown a fundamental disrespect for the law. And the district court's observation was well-grounded. It was clear that the Appellee had continued to mis-mark- But counsel, the whole issue here is does the statute afford a $1,500 penalty or $500 per item? So go straight to that. Yes, I'm going to. I think the district court erred in saying that there was only one penalty because the district court felt constrained by a body of case law, which itself failed to reconcile or consider even the plain language of the statute, which is the beginning and end of this court's analysis. I actually don't disagree with you much on that. London seems to be the prevalent case, so why don't you tell me what's the difference between there and London? The primary difference, Your Honor, is that Congress has acted between 1910 when London was handed down by the First Circuit and where we are now. In 1952, Congress changed the language in the patent law, Section 292, to change from a minimum penalty of $100 per offense to a maximum penalty of $500 per offense. Your argument is we should view that as an intention to make it applicable to every single item as opposed to a sole penalty. Yes, Your Honor, because it does then avoid the entire problem that was pointed out by the First Circuit in London. Under the old language, the original language that was enacted in 1842, and up until the change in 1952, a court was required to impose a minimum penalty of $100 per offense. So as the court recognized in London, that could create astronomical fines where you have mass-produced articles. I imagine you're not suggesting that the statute as currently written would ever necessarily require a district court to do $500 per item. I mean, if this is a little tiny piece of a small thing, it's insignificant. They could do a penny per item. They could do $0, or even a fraction of a cent. Could they do $0? I don't think they could do $0. I think they can. I think the case law has recognized they could do $0, and it would be my position that they could do $0, because the statutory language says not more than $500. So anything less than $500 is OK. Your case doesn't stand or fall on $0, though, does it? No, it does not. And I truly hope that we don't get, if in fact we get remanded, that the judge decides to go for $0 on our offenses. But I recognize the possibility that it could be any number less than $500. Mr. Rezekieff? Or $500 or less, I mean, technically. You also contest the point at which that penalty kicks in. The district judge here didn't find that there was intent for false marking until after a second summary judgment motion. But it strikes me that you've got real competing policies here. In order to get damages at all, you have to mark your product. So of course, you have to aggressively be marking everything. And then you might get a summary judgment against you. And do you suddenly have to stop marking? It strikes me that there would be a point there which you'd be afraid to stop, or you'd lose your damages. And yet, you've just received an adverse ruling. Discuss this with me. Why would we want a very strict rule that you seem to wish to impose, that as soon as there's the slightest cloud over the patent, you have to stop marking? Well, Your Honor, I think if it's characterized that way, as the slightest cloud over the mark, then I think that there would be difficult questions. I think I submit that this is not that case. This is not a case where there was a slight cloud. That was a thunder cloud that was as large as the sky. As the district court recognized. But isn't the district court, I'm asking it from the vantage point of, isn't the district court right to be cautious? Shouldn't we sustain his action in waiting for that thunder cloud to really erupt in thunder? Well, the district court's recognition or concern was one which is unique. And there's no case law that the district court could cite, or anything that I could find, that suggested other courts had made that kind of balancing test. It said that once you have a ruling that makes it clear that your product no longer is marked properly, that you can continue to persist in that false marking. So the district court was going out on a limb there and treading on new ground. But more importantly, there is case law. And this, again, is in the infringement context, not the false marking context, where courts have recognized that a party has to reassess. Typically, after getting a decision on a marking hearing, has to reassess at that point. After hearing the wisdom of the court, whether, in fact, it does have a legitimate claim anymore. And I submit that that's precisely the kind of reassessment that needs to happen after any ruling by the court during the course of a patent mismarking case. What about the district court's view that neither of the summary judgments had been heard on appeal yet, and this court has a somewhat embarrassing reversal rate for district court judges of claim construction? And so given that, why wasn't it prudent for the district court to say, well, after the first summary judgment, which has not even been heard on appeal yet, it wasn't necessarily wrong for them to not stop marking until the appeal was heard. And it was validated that this was, in fact, the correct claim construction and that your own claims don't fall within it. Your Honor, I think that concern would be better placed if the facts in our case hadn't played out the way they did. Because, in fact, with no more than, well, I guess it was two summary judgment rulings by two different district courts, the party that appealed did, in fact, recognize that it didn't have a claim. When you say two summary judgments, well, the district court found them guilty of false marking after the second summary judgment, correct? I mean, that was the timing. Not until, not then even. In this case, the district court wouldn't even say at that point in time. Until you had the lawyer's opinion. Until the lawyer for, I believe. By that time, it's pretty clear when his own lawyer said, stop, that he'd better stop. There's no question about that. But you're not arguing that that's the first point where you can safely say, stop, are you? Shouldn't there be some obligation to believe what the courts are telling you? Yes, absolutely. I think that I disagree with the district court in waiting until November of 2007 when the patent attorney actually advised the appellee to stop using the mark. I think that the sufficient knowledge existed for the appellee to be liable for false marking. Because remember, this court determined in protect. We're trying to figure out where in the spectrum. And the problem is, you want to push it back so far that we're afraid maybe it's not good for policy to go back that far. And maybe this district court didn't get it exactly right. But it is a clearly erroneous review standard here. Right, I don't think we should. I'm trying to figure out where that magic line should lie. Well, I think it's important to remember, and we shouldn't lose sight of the fact, that there are cases where there is not even a need for a ruling from any court, any district court, in order to determine that the party has sufficient knowledge to be liable for false marking. And this court in Klontek in 2005 determined that so long as you have false marking and knowledge that the marking is false, that's the end of the story. And you've got sufficient knowledge to satisfy the intent requirement under section 292. Can I explore that knowledge requirement with you for a second? What if I think my product is covered by the doctrine of equivalence? That, I think, is erroneous as a matter of law. Why is that? It's infringement. By law, it's infringement. And therefore, covered by the patent, why can't I mark that product as covered by the patent if I have confidence that it's a doctrine of equivalence case? Because I think that confidence would be belied by the actual law on doctrine of equivalence. The doctrine of equivalence provides protection or provides grounds for pursuing another party who is infringing. And you can use, as a plaintiff, the doctrine of equivalence to show that a party has infringed on your product. But you can't use it affirmatively to show that your own product has the title to be marked. Your argument, I take it, is that given the vagaries of the doctrine of equivalence, you can hardly pin a good faith belief on it. Right. And I think, in fact, there's some support in the case law, which we've cited in our brief to say that this problem. The cases in litigation and the trial judge has given some indication of where the trial judge is going to come down on the false marking question. And the patentee marks his product, says to his manufacturer, get some of that out there quickly. And it all gets out into the stream of commerce, at which point the trial judge and the court of appeals overnight says, wrong. What do we do about the stuff that's already in the stream of commerce? Well, I think you'd have to look at what was in the head of the mismarker as of the time he put the information or put the products out into the market. Obviously, you wouldn't look at it after that time, after the ruling came down. Because if, in fact, under your hypothesis, the products are already out in the marketplace, no obligation on the part of the mismarker, now that he realizes he's mismarked, to get all that stuff back out of the stream of commerce, does the mismarking have, if you will, continuing effect? Your Honor, I do not believe it does. I think that what we'd look at is what the state of mind was of the mismarker at the time he gave the instructions to the factory, for example. That would be fair to do. And in your hypothesis, I think it would be pretty damaging evidence. But that would be what you'd look at. The statutory language doesn't say anything about a recall of the products once they've been mismarked. That would not be something that's embraced within the statutory language, which has, of course, touched them for the court's analysis. But again, I don't want the court to lose sight of the fact, not that you have, but that there is a possibility. And in fact, in the DP Wagner case, I believe there was a finding of a liability for false marking without any kind of rulings from the court. It wasn't during the course of litigation. Our case presented a unique situation because we had this continuum of events. And the trial judge decided not to determine that there was liability or sufficient knowledge until late in the game. But that, we argued, actually occurred even before Soup was filed. Back to the basic idea of whether there's one offense or an offense each time you mark. If we follow your rule that there's an offense each time you mark, won't we be encouraging marking trolls, people who will start seeking opportunities to sue patentees for false marking? I guess my answer to that is twofold. In fact, we've even got an amicus here who's pretty close to that, don't we? Right, and that's obviously not my rule. I know. There's an interesting article recently published about that whole issue. I'm sure you're familiar with it. Right, and my answer to that is twofold. One is that I'm not certain that you would necessarily be encouraging that because of the latitude, which still rests with the district court in determining the amount of the fine per offense. So if you have a situation where there might be 10,000 or 100,000 articles that were mismarked, but it's not the situation, such as my case, where there was conduct which I would consider egregious, then any mismarking troll would be taking on that case at its own risk, not knowing what the district court might say in terms of the fine per offense, because it could be a fraction of a cent or as low as zero, and they might not end up with anything. And you think it's up to the district courts to police the trolling? Yes. Rather than for us to have a rule that precludes or at least discourages it. Well, I'm not sure that, given the statutory language, there's much that this court can do to police that. I mean, the district courts, under the statutory language, have the latitude to determine the amount of the fine up to $500. And so that would be, and then my second point. We could discourage the trolling by continuing to follow the London rule, couldn't we? You could, but that would be with the significant downside of hamstringing district courts in cases like mine, where there is a deliberate mismarking that's egregious and lasts for a longer period of time. So the question is, which is the bigger policy risk to the system, your case or the potential for trolling? Your Honor, that is one way to look at it. But I suggest that, in fact, there's always going to be uncertainty. Under both scenarios, I will recognize there would be some uncertainty. The advantages of taking the position that I'm proposing is that, one, it's consistent with the language of the statute, the plain language of the statute. That's irrelevant. We want something else. But assuming the importance of that, it eliminates the danger that we see in my case. And in future cases, where courts would say, well, there was a large manufacturer who millions of products out into the market, but it only made one decision to mismark. And so I'm only going to impose a $500 fine. I can only impose a $500 fine. That would no longer be the case. The district court can still choose to impose a fine of only $500. But on the other hand, the district court, under our proposed position, would have the latitude to impose a fine which was actually meaningful, which is not the case, given the current interpretation, I'd suggest misinterpretation, of the clear statutory language. That's something that district courts do not have the latitude. What do you think is the harm of false marking? Where's the harm? There are a number of harms, Your Honor. One is that a patent, as I'm sure this court recognizes, gives a sort of monopoly to the patent holder. And it has an anti-competitive effect. And so if- So given, see, this is, so you kind of jumped on board with Judge Rader's characterization of the Green Briefers being close to a troll and almost having a negative connotation there, given that false marking would cause competition to decrease, people might not compete because they see the patent number. Well, I'm not going to bother with that then. Then there's nobody who really has the incentive to bring the false marking. And we don't know how deleterious this is on competition generally. So maybe we ought to be, just like the statute does, rewarding the troll with the Green Brief who comes forward because he's going to eliminate these people who are in competition. So rather than sort of go along with the notion that the policy behind all of this is negative and cuts against your case, I thought maybe you'd defend it a little bit. Judge Moore, you're exactly right. And if Judge Klager hadn't rudely interrupted me in my answer to Judge Rader, that was the twofold answer I was intending to give. My first answer was, yes, in fact, there is that risk. But I don't think it's bad. And on the other hand, maybe we do want to encourage parties to take this action. I think the twofold answer you should give now is to realize you're a minute over your time in total. So thank you, Mr. Azak. Thank you very much. We'll restore a minute of time to Mr. Azak. And if you'd give two minutes to Ms. Tassin in addition to what she has, that'll equalize the time for both parties. May it please the court. I'd like to pick up right where you left off and look at the Congress's intention when enacting the statute of 292. If we look back, talking about what Mr. Azak said, that he said the case law misinterpreted the term offense, the case law that we have 100 years of precedent before us that has interpreted offense to be a distinct decision to falsely mark. Look, but that can't be right. Can it? Think for just a minute. My colleague has given a pretty good view of how this can be anti-competitive to mark, mismark products as patented. If it's only one $500 offense, and I'm a big company putting out millions of products, doesn't it pay me to mismark? The most my fine is $500, and I can dampen competition all over the market. It pays for me to violate, to mismark, doesn't it? Well, I don't know how much of a deterrent it's actually going to be. Almost none for any company, even for small companies. $500 can't be much of a deterrent. But determining what constitutes an offense under the statute is Congress's job. Determining the amount of the penalty under the statute is Congress's job. And if Congress sees this as not being a deterrent, then it's Congress's job to go in and change it. In 1952, when Congress amended the statute, Congress specifically cited to the body of law. So you think it's Congress's intent to allow parties to mismark their products rampantly and only pay $500? I don't think that that's Congress's intent, is to have parties mismark their products rampantly. But when Congress looked at the case law. But that's what will happen under your interpretation, right? But if Congress sees it as a problem, then it's Congress's job to go in and change it. When Congress made the amendment in 1952, they were aware of the case law that was out there. Maybe that's exactly why they made this change. That was his argument. But the courts were interpreting the $100 minimum as a maximum. So he said that's. Every such offense? Isn't that what it says here? Every such offense? Every such offense. But you have three parts to an offense. You have the marking of an unpatented article with the intent to deceive. And we can't read that out. And when we look at Congress's language, they give us three ways to violate the statute. Marking, affixing, or advertising. Let me rudely interrupt you once again. Let's look at that statute. Let's look at it together. Section 292, false marking, sub A, talks about in connection with anything, anything made, used, or offered. B says, whoever marks in connection with any unpatented article. And then in the very next paragraph, whoever marks upon or affixes, et cetera, in connection with any article. Three times, it seems to me, they said in a very clear singular term, we're talking about an article or a thing. We're not talking about an event, or a time frame, or a continuing activity. We're talking about an article. How do we read the statute, assuming the statute reflects what Congress intended? And occasionally, we do rule that way. How do we read the statute any other way than it applies to each individual thing or article? Random House defines article as being either an individual unit or a portion of a class. When we look at the three violations, not just two, not just marking or affixing, when you look at advertising in connection with any unpatented article, commonly, you mark an individual article, or you affix the patent number to an individual article. But you don't advertise in connection  You advertise in connection with a class, a class of article. And the definition of article. Ford advertises a particular car all the time. But it's advertising in an advertising medium, like commercials, or websites, or brochures. It's not attached to the particular article like the patent number is. So if we focus on per article, then when we have a false advertising violation, then how do you assess penalties per article? You have to do it some other way. You have to do it per publication, per hit on a website. And then we get totally outside the language of the statute. I'm not up here arguing that Congress perhaps doesn't need to step in and remedy this situation. But that's Congress's job to do it. Those cases didn't just interpret the fine, the amount of the fine, incorrectly. Those cases were also interpreting offense. Congress was aware of that interpretation and specifically said, no, you're misinterpreting the amount of the fine. But they did not say you're misinterpreting the definition of offense. They let that go. They amended again in 1994 and did not change the language of the statute. And courts for over 100 years have almost unanimously said that it's a distinct decision. It's not every time the printing press or the mold marks on the individual product that you have to have intent to deceive. So that's Congress's job to step in if they are unhappy with the way the statute is being interpreted. And getting to the key time issue, getting to the issue of astronomical fines, counsel for bond tools says that, well, there's not the danger now because we have this maximum fine and you can assess a penalty as low as you want. Well, I would take issue with being able to assess a zero penalty because this statute is penal in nature. And Congress intended there to be a penalty when someone mismarks a product. So I don't know that we can say zero. You all both seem to, and I think the court for that matter, seem to think this was a criminal statute. I'm puzzled by that. I don't find anything in there that calls for incarceration. Seems to me it's a civil penalty. Am I misreading something? It's a monetary penalty. But in the Senate report, Congress did say that the statute is criminal and provides for an informant type of action. So Congress itself has said that. There are no criminal cases that I've seen out there at all. It's always civil cases. But it is penal in nature. And if we look at the Solo Cup case that we sent you a couple of weeks ago, it is a prime example of what can happen if we start assessing penalties per article. The plaintiff sued the defendant for allegedly false marking over 21 billion products, 21 billion. If we have to assess a fine per article, even a dollar is over $21 billion, or a penny is over $217 million. And so, I mean, I don't think we can assess it. That's like zero to me. Yeah, I mean, it's, and the amicus in this case. Well, but you could do a tenth of a penny, or a hundred. You could do a tenth of a penny, but even a quarter of a penny is over $2 million. Point being, if it can be adjusted to any subset, maybe not zero, but any subset, one one thousandth, or one one millionth of a penny, it means that the court can find a mechanism for controlling this problem. Potentially, the court could find a mechanism for controlling, but we would have to get so small. And we still have companies, holding companies, that are being created out there simply to create litigation. It's simply to create, in this particular case, the amicus is a holding company that was created solely to create litigation. You say that with such disdain. Well, I mean, the patent laws are out there to protect intellectual property, or to promote creative ideas. And I guess just as a lawyer, perhaps, just creating litigation, just out there trying to sue potential or would-be false markers. You're not feeling anti-trustful, you know. No, not a big fan, so. How do you feel about the environmental stack? No. We probably should stick to what we're talking about here. But going to the issue of intent as well, Bantul has brought up on appeal that the trial court, in fact, Bantul argued to the trial court that she should not have considered subjective criteria at all. That was the argument below. The arguments changed a little bit here into, well, she rested or she concluded on subjective criteria. And the record does not support that. If you look, the judge gave a very thorough and well-reasoned eight pages in her final judgment devoted to this, four of which went to stating the law, the standard that she was supposed to follow. What about the timing? Can I ask you about that? Sure. Do you mind if I turn you to that? Go ahead. Why did we have to wait till two summary judgments and his own attorney smacking him on the hand? I mean, why not a little sooner than that? Well, actually, the record reflects and the testimony shows that what he did was as soon as he got our summary judgment ruling in August, he called up the manufacturer and said, stop putting the patent number on the product. The attorney's advice was that we have two stilts here. We have the SS and the S2. The S2 cannot have a liner in it. There can be no resiliently lined yoke. He called up and said, take the patent number off the stilt. You've got to stop doing it. This other stilt, the SS stilt, is the one that can have the liner in it. That is when the attorney stepped in and said, you need to put a liner in there or you're going to have to take the patent number off. And that was done about the same time the second summary judgment came out. Did the manufacturer have an obligation when a federal court says you're wrong to just stop right then and there? Well, and that's what he did. And that's what I wanted to clarify, because it was Bond Tools counsel is saying, it's when the claim construction came out that he should have stopped or he should have appealed. When the summary judgment came out and said, no, Bond Tools stilts are not covered, that's when he started thinking, well, maybe my stilts aren't covered, too. Because they're identical. If Bond Tools stilts are covered, I mean, the summary judgment was not on false marking. It was on patent infringement. The trial was on false marking. So we didn't have a ruling saying, your stilts aren't covered. It just raised a red flag. Well, if his stilts aren't covered, mine maybe aren't either. And so that's when he picked up the phone and called and said, take it off. And so, and then the second. It didn't actually come off, did it? Well, it came off of the stilt itself. What came out at trial was that there is a universal foot plate that's put on all the stilts they manufacture that has the patent number on it. And he found that the week before. So that was the basis for the judge's finding of false marking, was the inadvertent on the universal foot plate. The district court didn't find it inadvertent, because? Well, she said, she did. She said that by that point, you should have known, you had knowledge. The fact that you didn't check the stilt good enough is not a valid defense. And therefore, I'm saying, as of November 15, you falsely marked. And so that was the basis for that portion of her decision. So the timing issue, it was claim construction. What Bantul says is that, well, you should have appealed the claim construction if you didn't like it. Well, we would have had to take an interlocutory appeal. Those are regularly denied. And I don't think the burden should be on the potential marker to take an interlocutory appeal. And they had an opinion of counsel. And it was for a stilt that was identical to their own stilt in almost all respects, and to the stilt that was Bantul's stilt. And so they relied on this doctrine of equivalence. You raise the issue of doctrine of equivalence. And in Quantech, this court didn't say that you can't look at doctrine of equivalence for potentially determining whether your own stilt is patented or not. And the Sixth Circuit, actually, in Gypsum said the same thing. And Brose and London had language, similar language, that said it should not turn on whether a lay person can read the patent just like lawyers can. But it should turn on whether they have a reasonable belief that their patent covers their stilt. And the court found here, not once but twice, in two very well-reasoned opinions, she weighed the facts, she weighed the evidence, she applied the correct standard. They filed a motion for a new trial. She looked at it again, devoted an additional four pages to it, and said, no, this is weighing all the evidence with objective criteria controlling. This is what I find. Are there any other questions? Thank you, Ms. Tessler. Thank you.  Thank you, Your Honor. I'd like to start with what I think is probably the most interesting argument we just heard. And that is one that has the most universal impact. That is that Congress, by taking some action in 1994, must be assumed not to have been concerned about the existing case law. That's contrary to the well-established doctrine of acquiescence that this court has already written about. In fact, Judge Plager, you were involved in a case decided back in, I think it was, 2002, Schism versus United States. And in that case, I'm sure you remember it well. You wrote the same thing in Pinney, actually. But not on this particular one. That's why I remember. The case recognizes that reading or trying to determine what Congress had in mind when it made an attempt to revise a statute is like reading tea leaves. And that it's not a reliable or important argument to consider unless there is clear evidence that Congress specifically did consider what was happening in the courts or, in the case of Schism, the agencies before it took action to amend the statute. But absent that kind of evidence, then it's not important to, or you cannot reliably determine what Congress was doing when it made some attempt to amend the statute. Thank you, Mr. Azek. Thank you, Your Honor.